IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:03CV286-03-MU

| | |
|---|---|
| JOHNNY MAX PUCKETT, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>DAVID MITCHELL; MARC EDWARDS; )<br>RICK TERRY, CHERRY HUSKINS, )<br>Respondents. )<br>_____) | **O R D E R** |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment (Document No. 23), and brief and affidavits in support of motion (Documents No. 24, 25), Plaintiff's response to Defendants' Motion, (Document No. 29), and Plaintiff's Complaint under 42 U.S.C. § 1983, (Document No. 1.)

## I. FACTS

In his Complaint, Plaintiff alleges that beginning sometime in 2001 he was assigned to work painting inside the jail at Mountain View Correctional Facility using Sherwin-Williams Kem-Kromik metal paint primer. Plaintiff claims that while using this product over a several month period of time[1] he repeatedly felt sick to his stomach, saw black dots and experienced a burning feeling on his skin. Plaintiff claims that the product he was using requires use of a carbon filter respirator. Plaintiff alleges that he requested a respirator but was told he could not have one.

---

[1] Although neither party provided the Court with the exact date that Plaintiff began painting, from the documents in the records, it appears that Plaintiff was using the paint primer at issue for approximately five months. (See Plaintiff Affidavit, Doc. 29, ¶ 4.)

1

Plaintiff does concede that at one point the air vent was turned on in the area he was working and one guard did give him a fan. (See Plaintiff's Grievance attached to Complaint ). On October 19, 2001, Plaintiff claims that the smell from the paint was so overpowering that he collapsed and crawled out of the area. Plaintiff was taken to medical where the nurse who examined Plaintiff, determined that his vital signs were normal and told the guard that Plaintiff needed some fresh air and could not work for the remainder of the day. (Defts' Motion for Summary Judgment, Ex. C.) On October 23, 2001 Plaintiff complained of headache, nausea, vomiting, dry throat and dizziness from painting without a respirator over several months. Nurse Practicioner Markland concluded that Plaintiff was experiencing a reaction to paint fumes and overexposure. Medical staff advised Defendant Sherry Huskins that Plaintiff could not continue to paint without a respirator. Defendant Huskins called medical back after speaking to Defendant Mark Edwards and informed medical that all painting would stop until further research could be done.[2] (Defts' Mot. For Summary Judgment, Ex. C.) On October 30, 2001, Nurse Markland contacted Carolina Poison Control regarding Plaintiff's exposure to Kem Kromik and concluded that a complete blood count and metabolic panel were needed and requested a pulmonary function test for Plaintiff. Plaintiff's blood count and metabolism were within normal limits and on November 19, 2001 these results were discussed with Plaintiff. (Id.)

According to Plaintiff, one to two months after he stopped painting he was diagnosed with pneumonia, then bronchitis and permanent asthma. Plaintiff contends these medical issues are a direct result of using the Kem Kromik paint primer.

Defendants submitted an affidavit from Dr. Barbara Pohlman, a self employed provider of

---

[2] Plaintiff was never asked to resume painting.

occupational medicine consultation services. Dr. Pohlman reviewed the product information and material safety data published by Sherwin Williams as well as Plaintiff's medical records. Dr. Pohlman contends that an overdose from exposure to Kem Kromik could occur in an enclosed, non-ventilated space over a period of hours. Symptoms of such an overdose include headache, dizziness and nausea. However, Dr. Pohlman contends that Kem Kromik does not cause chronic nausea or dizziness and only in an extreme situation would an overexposure lead to loss of motor coordination. Furthermore, signs and symptoms of overexposure would not include shortness of breath or breathing problems and overexposure to Kem Kromik does not produce lung damage. Dr. Pohlman contends that only after years of improper use of Kem Kromik would adverse effects on the liver or urinary, cardiovascular or reproductive systems appear.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This standard, by its very terms, provides that the mere existence of some alleged factual dispute between the parties will not defeat a properly supported summary judgment motion; rather the rule requires that there be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "Only disputes over the facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. Moreover, the moving party has the initial responsibility of informing the district court of the basis for its motion,

and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes will demonstrate the absence of any genuine issue of material fact." Celotex Corp. v. Cateret, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P.56(c).

### III. ANALYSIS

**A. Plaintiff Cannot Show that Defendants Were Deliberately Indifferent**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1991). An Eighth Amendment cruel and unusual punishment claim has two elements: objectively, whether the deprivation of a basic human need was sufficiently serious, and, subjectively, whether the defendant had a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294 (1991). The objective component requires that a Plaintiff show that the deprivation of a basic human need was 'sufficiently serious' to rise to the level of cruel and unusual punishment. Rish v. Johnson, 131 F.3d 1092 (4th Cir. 1997)(quoting Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993)). In determining whether an alleged harm is sufficiently serious to satisfy the objective component of a cruel and unusual punishment claim courts are guided by contemporary standard of decency. Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). "Conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Additionally, the Constitutional prohibition against cruel and unusual punishment "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure's of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991)(citations omitted).

4

The subjective component of a cruel and unusual punishment claim when a prisoner is complaining about conditions of confinement is that of deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 835-6 (1994). A prison official, therefore, may be held liable for acting with deliberate indifference to inmate health or safety only if he knows that inmate faces a substantial risk of serious harm and disregards it by failing to take reasonable measures to abate such risk. Id. at 836. " To convert conduct that does not even purport to be punishment into conduct violative of the Eighth Amendment, 'more than ordinary lack of due care for the prisoner's interests or safety' must be shown." Stephens v. Johnson, 83 F.3d 198, 201 (8th Cir. 1996)(quoting, Whitley v. Albers, 475 U.S. 312, 319 (1986).

Applying this legal standard to Plaintiff's Complaint, the evidence shows that Defendants did not deliberately deprive Plaintiff proper medical treatment because immediately after Plaintiff complained of side effects from painting, he was taken to medical and treated appropriately. Further, in a very short time from when Plaintiff first complained of feeling ill from painting, he was seen by medical twice, Carolina Poison control was consulted and a complete blood count and metabolic panel were completed on Plaintiff. The results of the blood count and metabolic panel were within normal limits. Furthermore, shortly after Plaintiff was seen by medical, the painting job was permanently stopped.

Additionally, applying this legal standard to Plaintiff's Complaint, the evidence shows that Defendants did not deliberately force Plaintiff to use paint in a way they knew to be dangerous (i.e. without a respirator or proper ventilation) because shortly after Plaintiff complained about side effects from working with the paint, they stopped the paint job. The label from the paint primer cautions that the product should be used with adequate ventilation and that "if you experience eye

5

watering, headaches, or dizziness, increase fresh air or wear respiratory protection or leave area. (Ex. C to Defts' mot. For Summary Judgment.) The evidence is that when Plaintiff first complained of side effects from the paint primer, he was taken to medical and told he could not paint for the rest of the day and advised to get some fresh air. Fresh air is exactly what the paint label advises if a person working with the paint experiences side effects from the paint. A few days later, Plaintiff again complained of not feeling well from working with the paint primer. Specifically, he complained of headache, nausea, vomiting, dry throat and dizziness. His complaints were specifically addressed by conducting a complete blood count and a metabolic panel, which came back as within normal limits. Most importantly, from that day forward Plaintiff was never required to work with the paint primer again. Defendants' actions in the face of Plaintiff's medical complaints cannot be said to be deliberately indifferent to Plaintiff's health or safety.[3]

### B. Plaintiff Cannot Establish that Defendants Caused His Lung Damage

Plaintiff complains that as a result of his exposure to the Sherwin Williams paint primer he has permanent lung damage and lung disease. However, the evidence is that Plaintiff was a heavy

---

[3] Plaintiff claims that asked Defendants Terry, Huskins and Edwards for a respirator, but was told he would not be supplied with one. The response to his grievance indicates that the facility did not have a respirator to give him and when medical informed them that Plaintiff needed one to continue the job, Defendants ceased the painting job. Plaintiff also alleges that he asked for fans and his request was denied. However, he concedes that at one point a guard did give him a fan. Plaintiff was not specific as to when he made these requests and it appears Plaintiff was using the primer for about five months or less. While there is contradictory evidence as to whether he was given a fan or not, it seems uncontradicted that Plaintiff was never given a respirator. If Defendants denied Plaintiff's request for a fan, that decision, in hindsight, was clearly a bad decision, but it does not rise to the level of deliberate indifference, especially in light of the fact that when Plaintiff exhibited signs of exposure, Defendants provided the necessary medical care and ceased the painting job.

smoker for years beginning at age eighteen. (Medical records at 0415.) Additionally, in 1996 Plaintiff reported smoking cocaine four times daily (Medical records at 0403), and in 2000 Plaintiff reported a fifteen-year history of cocaine use without needles. (Medical records at 0337.) Dr. Pohlman, Defendants expert witness, is of the expert opinion that Plaintiff's lung damage and disease would have occurred without any conduct by the Defendants. Dr. Pohlman emphatically stated in her affidavit that, "[i]n my opinion, based on my education, training, experience, and review of Plaintiff's inmate medical records, existing damage to Plaintiff's lungs from chromic smoking of tobacco and cocaine created his disposition to pneumonia, bronchitis, and asthma attacks. It can be said to a medical certainty that the mild and short-term exposure to Kem Kromik documented in Plaintiff's medical records did not cause him to contract any of these diseases or increase his risk of contracting them." (Pohlman Affidavit 5-6.) Plaintiff disagrees with Dr. Pohlman and insists that because he did not have any lung problems before he used Kem Kromik paint and that all of his lung problems started after his exposure to the paint primer, they can only be a result of his exposure to the paint primer and not his long term history as a smoker and fifteen-year history of using cocaine without needles. Obviously this argument is not persuasive. Plaintiff's personal opinion is not sufficient to rebut Dr. Pohlman's expert medical opinion. Plaintiff cannot establish the his exposure to the paint primer is what caused his lung disease, but more importantly, as outlined above, Plaintiff can not establish that Defendants were deliberately indifferent to his health or safety. For these reasons, Plaintiff's Complaint must be dismissed and Defendants' Motion for Summary Judgment is Granted.[4]

---

[4] It also appears that Defendants would be entitled to summary judgment on the issue of qualified immunity. However, the Court has not ruled on this issue because as outlined in section A, the Defendants were entitled to summary judgment on the issue of deliberate

## IV. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Plaintiff's Complaint is Dismissed for failure to state a claim for relief and Defendants' Motion for Summary Judgement is GRANTED.

---

indifference and because Plaintiff has not specified in his pleadings the specific constitutional right he alleges Defendants have violated.

**Signed: September 13, 2005**

Graham C. Mullen
Chief United States District Judge